In re Jason J. SCOTT and Clichelle C. Scott, Debtors.

John O. Murrin and DeVonna K. Murrin, Plaintiffs,

v.

Clichelle C. Scott, CFO of Accredited Financial Services, and Jason J. Scott, Defendants.

Bankruptcy No. 07–30643.
Adversary No. 07–3110.

United States Bankruptcy Court, D. Minnesota.

April 10, 2009.

Chris LaNave, John O. Murrin, Madison, MN, for Plaintiffs.

William G. Selman III, William G. Selman III Attorney at Law, Minneapolis, MN, for Defendants.

## ORDER RE: DEFENDANTS' MOTION FOR DISMISSAL

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding for determination of dischargeability of debt came on before the Court on the Defendants' motion for dismissal. The Defendants ("the Debtors") appeared by their attorney, William G. Selman, III. Plaintiff John O. Murrin appeared for himself and for DeVonna K. Murrin. Upon the moving and responsive documents, the content of the Plaintiffs' second amended complaint, and the arguments of counsel, the Court memorializes the following order.

### PARTIES

The Debtors [1] filed a voluntary petition under Chapter 7 on February 27, 2007. On their Schedule F, they listed a claim in favor of the Plaintiffs, noting it as "2007 CONTIGENT [*sic*] CLAIM."

The Plaintiffs are a married couple. They timely commenced this adversary proceeding for a determination of the dischargeability of their claim against the Debtors.[2] Before the Debtors filed for bankruptcy, the Plaintiffs had commenced a lawsuit in the Hennepin County, Minnesota District Court, in which the Debtors were among multiple named defendants. In that action the Plaintiffs complained that they had been induced by certain persons to "invest" $600,000.00 into Avi-

---

**1.** All further references under these words will identify both of the Defendants, collectively. References to an individual debtor will be by name.

**2.** Plaintiff John O. Murrin is an attorney-at-law licensed in Minnesota. On the original complaint, he held forth the status of "Attorney for Plaintiff [*sic*]." In actuality, he appears *pro se* on behalf of himself, and as counsel for his wife, the other plaintiff.

digm Capital Group, Inc. ("Avidigm").[3] They alleged that the inducements had been fraudulent; that "security" for their "investment" had never been furnished as promised; and that other, later actions by certain of the defendants deprived their "investment" of all economic value.

The Debtors' bankruptcy filing stayed the Plaintiffs' further prosecution of this lawsuit, as against the Debtors. The pleaded fundaments of this adversary proceeding are nearly identical to those of the state court litigation: an asserted right to damages in a large amount, the imposition of a constructive trust or equitable lien, an accounting, and various other equitable relief. In the state court these demands for relief are framed under common law, statute, and equity. They are reprised here, with an overlaid request for an exception from discharge in the Debtors' bankruptcy case.[4] All of this sounds in tort, or under principles analogous to the law of torts; nowhere do the Plaintiffs allege that the Debtors are indebted to them on a commercial basis, i.e., via a loan or other extension of credit.

## PROCEDURAL BACKGROUND IN ADVERSARY PROCEEDING

The text of the Plaintiffs' original complaint was 45 unnumbered pages in length, plus a three-page documentary attachment. It is an understatement to note that the wording of the text was dense, repetitious, fervid, and hyperbolic.

The Debtors responded by timely filing an answer. It is fair to say that their attorney labored to answer all of the complaint's lengthy, overlapping fact averments and accusations, over the answer's 21 pages. He specifically raised inadequacy of pleading as a defense, citing several procedural rules.

At a scheduling conference conducted on September 12, 2007, the Debtors' counsel expressed his concerns over the length and prolixity of the complaint, and its relative lack of direct references to acts by the Debtors that could be linked to any harm that had been inflicted on the Plaintiffs by or through Avidigm. The Court concurred on the matter of the complaint's length and complexity; anyone would have difficulty separating out any allegations of fact that went to the Plaintiffs' specific claims against the Debtors from the lengthy tirades about an alleged "scheme" and "conspiracy" centered around Avidigm.

On behalf of the Plaintiffs, John Murrin offered to amend the complaint he had drafted. This resulted in two successive motions for leave to amend. The Court denied the first on the ground that the proposed amendments neither simplified the text of the complaint nor shortened it

---

3. The Plaintiffs describe Avidigm as a business entity that was to conduct various profit-making activities in the residential housing sector. Among other things, it appears that Avidigm was to undertake some sort of foreclosure-amelioration operation, through which financially-distressed homeowners would convey title to their homes or transfer their post-foreclosure rights of redemption to Avidigm under arrangements that were to produce a sizeable return to Avidigm.

4. In October, 2007, the Plaintiffs made a motion in the Debtors' Chapter 7 case, for relief that would permit them to go forward against the Debtors in the litigation in the Hennepin County District Court. The motion was styled as one pursuant to 11 U.S.C. § 362(a)(6), for relief from the automatic stay. As a technical matter, the bankruptcy stay had already terminated upon the grant of a discharge to the Debtors, 11 U.S.C. § 362(c)(2)(C); so the motion was treated as one for abstention from the overlapping counts of the two complaints, i.e., those sounding under nonbankruptcy law. The motion was denied without prejudice. The basis for the ruling was that it was more appropriate to determine the effect of discharge on the Plaintiffs' claims before subjecting the Debtors to the burden of defending them on the merits under nonbankruptcy law.

at all, and certainly did not clarify the basis for a dischargeability claim against the Debtors. The Plaintiffs presented a second repleading via a renewed motion. That effort reduced the length of the complaint, but just barely—to 39 pages. The Court granted the Plaintiffs leave to interpose that version of their complaint, over the Debtors' objection. This was done on an explicit recognition: the field was left clear for a dispositive motion from the defense, for dismissal or judgment on the pleadings. A deadline for the filing of an answer to the second amended complaint was then set.

The Debtors' motion for dismissal followed, as an alternate form of response. It is now at bar.

## NATURE OF MOTION

The Debtors have moved for a final disposition of this adversary proceeding in their favor, on the ground that the content of the Plaintiffs' second amended complaint simply does not plead sustainable causes of action against them.[5] Their attorney framed the motion in the alternative. He first asserted that the Plaintiffs had failed throughout the complaint to "state with particularity the circumstances constituting fraud" on the Debtors' part, as required by Rule 9(b); then he argued that the complaint was subject to dismissal under Rule 12(b)(6), for its "failure to state a claim upon which relief can be granted." [6]

## DISCUSSION

### I. Standard to be Applied on Motion for Dismissal

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929

(2007), the Supreme Court reformulated its guidance for the judging of motions for dismissal under Rule 12(b)(6). First, it rejected the long-standing shibboleth from the text of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 561, 127 S.Ct. at 1968.

Despite that holding, much of the analysis under Rule 12(b)(6) is the same in the wake of *Twombly*. A complaint's fact allegations *as actually pleaded* are still to be assumed as true. 550 U.S. at 555, 127 S.Ct. at 1965. *See also Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir.2009). And as a continuing, general rule, though plaintiffs "need not provide specific facts in support of their allegations ..., they must include sufficient factual information to provide the 'grounds' on which [their] claim rests ..." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 222, 172 L.Ed.2d 142 (2008) (citing *Twombly*, 550 U.S. at 553–556 & n. 3, 127 S.Ct. at 1964–1965 & n. 3). *See also Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir.2008). But though the *Twombly* court cited many of its previous opinions under Rule 12(b)(6), the decision's phraseology implied a more skeptical scrutiny: "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements

---

**5.** For brevity, the third iteration of the Plaintiffs' pleading, the subject of this motion, will be simply termed "the complaint," or "the Plaintiffs' complaint."

**6.** The Federal Rules of Civil Procedure bearing these numbers are incorporated by FED. R. BANKR.P. 7008(a) and 7012(b), respectively.

of a cause of action will not do." *Twombly*, 550 U.S. at 553–555, 127 S.Ct. at 1964–1965 (citing and quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

In a nutshell, establishing a new touchstone modifier, to withstand a challenge under Rule 12(b)(6) a complaint must state "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974. In a comparative sense, for a complaint to "state a claim," its recitation of facts must "raise a right to relief above the speculative level," 550 U.S. at 555, 127 S.Ct. at 1965; they must go beyond a *"possibility* ... of entitlement to relief," to a *"plausibility,"* 550 U.S. at 557, 127 S.Ct. at 1966 (emphasis added).

This is the guidance for the analysis of this motion, which the Debtors' counsel framed under Rule 12(b)(6). The Court contemplated just this sort of presentation, when the Plaintiffs' renewed motion for leave to amend was granted.[7]

## II. Dismissal: Its Position and Consequences in the Context of Bankruptcy

The Plaintiffs pleaded their requests for determination of dischargeability in a disjointed and scattered fashion. Count I is a 15–page repository of rambling, non-sequential fact allegations and rhetorical assertions, offered to support these requests. Throughout Count I, the Plaintiffs cite 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6). Later, in Count IX the Plaintiffs plead various facts to support a prayer for damages for "FRAUD WHILE ACTING IN A FIDUCIARY CAPACITY EMBEZZLEMENT OR LARCENY." They add a one-line request "[t]hat this be declared a debt that is non-dischargeable." In Count X, they recategorize "the conduct alleged above," attributed to Clichelle Scott and others named and unnamed, as constituting "willful and malicious by the debtor as to Avidigm['s] ... money adversely affecting the rights of creditors and investors of which the [Plaintiffs] were one." They reprise previously-described events and acts; and on that basis they request another award of damages, that "[n]o discharge should be issued," and "[t]hat this be declared a debt that is non-dischargeable." It is not clear why the asserted factual bases for these legal theories were spread so far over a complaint that was already cumbersome enough. But they were.

The starting point for the treatment of the Debtors' motion comes back to the nature of the relief requested, as to the

---

7. As part of their response to the Debtors' motion, the Plaintiffs submitted numerous documents, affidavits, and other material extraneous to the text of their complaint. When such material is presented, the motion must be treated as one for summary judgment under Rule 56, unless such "matters outside the pleadings are ... excluded by the court." FED.R.CIV.P. 12(d), *as incorporated by* FED. R. BANKR.P. 7012(b). In the several prior sessions before the Court, on the record and off, John Murrin was advised that the Court needed, and the Debtors were entitled to, a "short and plain statement of the [Plaintiffs'] claim showing that the pleader is entitled to relief," FED.R.CIV.P. 8(a)(2), *as incorporated by* FED. R. BANKR.P. 7008(a). He was warned that this adversary proceeding would not proceed through a discovery process unless the Plaintiffs provided one. Despite two opportunities for repleading, the Plaintiffs have not made their complaint materially shorter or plainer. If they can not set forth in an initial pleading a story of victimization that logically points to the Debtors as perpetrators, and that is coherent, logical, and grounded in specific events, they should not be allowed to lever the evaluation of their pleaded case into a welter of extrinsic material. Thus, all of the Plaintiffs' ancillary submissions are excluded from the consideration of the Debtors' motion. The motion will be analyzed solely on the content within the complaint's four corners.

bankruptcy process initiated by the Debtors: through these three counts, the Plaintiffs sought a determination that the Debtors' liability to them, if any, was excepted from discharge. A ruling for the Plaintiffs on the merits of these counts would leave the balance of the counts in their complaint here—and all of the claims still in suit against the Debtors in the Hennepin County District Court—viable and open to further litigation. To opposite effect, a dismissal of these counts would prevent any possible exception from discharge in favor of the Plaintiffs. This would mean that the Plaintiffs' claims against the Debtors had already been subjected to discharge in bankruptcy.[8] The Plaintiffs would be barred from pursuing the remaining claims in either forum, by the discharge injunction of 11 U.S.C. § 524(a)(2).[9]

It is fair to presume that the Debtors filed for bankruptcy to relieve themselves of the burden of their pre-petition debt, including the transactional costs attendant to fixing and liquidating any such liabilities that they contested; so they are not at all out of line in making the motion at bar, as an effort to gain the practical benefit of discharge for themselves as early as possible. However, the broad debtor's remedies of bankruptcy are for the proverbial "honest but unfortunate debtor," *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). *See also In re Molitor*, 76 F.3d 218, 220 (8th Cir. 1996); *In re Graven*, 936 F.2d 378, 385 (8th Cir.1991). And, debts that were tainted by a debtor's wrongdoing in the inception may be carved out of the debtor's remedy of discharge. *E.g., In re Miller*, 276 F.3d 424, 429 (8th Cir.2002). *See also Farmers' Sav. Bank v. Anton*, 1 F.2d 103, 105 (8th Cir.1924) (discharge in bankruptcy "is intended to relieve misfortune, but it must be misfortune coupled with absolute honesty").

Thus, the question at bar is whether the Plaintiffs have pleaded a "plausible" factual theory for such an exception, i.e., adequately-described wrongdoing by the Debtors, of a tortious nature, specifically directed at the Plaintiffs, that would fall under one of the statutory exceptions. The vetting of the Plaintiffs' complaint is a three-fold process, governed by the provisions of 11 U.S.C. § 523(a) that they spread over Counts I, IX, and X.

III. Application of 11 U.S.C. § 523(a)

*A. Threshold Issue: The Capacity in Which the Debtors are Being Sued, as Pleaded by the Plaintiffs*

▪ The text of the Plaintiffs' complaint is so long, so complex, and so convoluted in rhetorical fervor that it is hard to isolate

---

8. Via the order of June 8, 2007, in BKY 07–30643. As Judge Kressel of this court has observed, "the scope of a discharge is final when entered"; but the full effect of a discharge might not be clear until later litigation results in a judicial determination. *In re Anderson*, 72 B.R. 495, 496 (Bankr.D.Minn. 1987).

9. This statute provides that:
 (a) A discharge in a case [under the Bankruptcy Code]—
 . . .
 (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; . . .

Under the Bankruptcy Code's definitional structure, any liability that the Debtors may have to the Plaintiffs is subject to discharge in bankruptcy, even though it has not been fixed or liquidated. *See* 11 U.S.C. §§ 101(12) (defining "debt" as "liability on a claim") and 101(5)(A) (defining "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, . . . disputed, [or] undisputed . . .").

the basic, structural aspects of the claims asserted against the Debtors. The Plaintiffs complain mightily about being wronged through the instrumentality of Avidigm. But, they never allege that either of the Debtors was an employee, officer, or authorized agent of Avidigm at any relevant time. They do plead that Clichelle Scott was the "Chief Financial Officer (CFO) and defacto Chief Operating Officer (CEO)" of Accredited Financial Services, Inc. ("AFS"). They state that, in that capacity, she

> actively participated in the commission of various torts hereinafter alleged and/or procured, directed, or advised, encouraged, aided or abetted or joined with others who were engaged in wrongdoing and the commission of various torts alleged hereinafter which involved her, through or with others using false pretenses and fraud to operate out of, through, Avidigm or ratified or adopted Avidigm actions and the actions of others as her action, and is therefore jointly and severally liable for all the resulting injury to the Murrins as set forth herein.

Complaint, ¶ 4, p. 2. They would also have liability for the use of Avidigm's operations imputed to her as "the alter-ego, co-conspirator, joint tortfeasor with other [sic] who controlled, managed and benefitted from the use of Avidigm, AFS, and other named corporate entities." Complaint, ¶ 3, p. 1.

The Plaintiffs plead very little as to Jason Scott's involvement in the alleged wrongs. The only allegation is that he "took part in some activities and is liable by reason of his involvement," with only one reference to a particular transaction, that involving "the Oakey properties." Complaint, ¶ 4, p. 2.

So there is never any specific allegation that either Debtor participated in an initial act of fraud on the Plaintiffs to induce them to put their money into Avidigm, by working directly through the instrumentality of Avidigm whether with or without authority. And though the Plaintiffs make allegations going to the Debtors' role in the alleged later destruction of the value of the Plaintiffs' "investment," they are almost all vague references of two sorts. The first is that they "actively participated" in something, but there is no detail at all as to date or nature of the acts or transactions. The second is that they joined, at some unspecified point, a "conspiracy" to mulct creditors and investors of Avidigm, like the Plaintiffs, and hence are to be held liable for everything the "conspiracy" allegedly did to destroy the value of "investments" into Avidigm, before or after the date on which the Debtors "joined." They attempt to load up the accusation of conspiracy by a broad but shallow invocation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*

Pleading like this is difficult to put through an analysis under Rule 12(b)(6) using the substantive requirements of the law of dischargeability. The remedy of discharge is personal to the individual debtor in bankruptcy, and hence the right to its benefit stands or falls on that debtor's own acts. *In re Petersen,* 175 B.R. 375, 377–378 (Bankr.D.Idaho 1994) (citing *In re Littleton,* 942 F.2d 551 (9th Cir.1991), for proposition that "[t]he issue of dischargeability must be resolved on the basis of each individual debtor's conduct"). The courts are to construe exceptions to discharge narrowly in deference to the fresh-start policy of the Bankruptcy Code. *In re Miller,* 276 F.3d at 429; *Geiger v. Kawaauhau,* 113 F.3d 848, 853 (8th Cir.1997), *aff'd,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The inquiry on dischargeability under 11 U.S.C.

§§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) focuses on the acts *of the debtor him- or herself.* *In re Porter,* 539 F.3d 889, 894 (8th Cir.2008).

As very general precepts, these considerations cut against imposing the sanction of nondischargeability on a debtor where the identified harm to a creditor was actually inflicted by a third party—even where the debtor and the third party were in a relationship that might impose joint civil liability on the debtor under nonbankruptcy law. To be sure, there is very old Supreme Court authority that contemplated nondischargeability for an innocent debtor's legal liability for harm caused by the fraud of a business partner. *Strang v. Bradner,* 114 U.S. 555, 561, 5 S.Ct. 1038, 29 L.Ed. 248 (1885). However, *Strang v. Bradner* imposed such derivative nondischargeability on agency principles, as applied to the debtor and non-debtor members of a legally-constituted business partnership. *Id.* In *In re Miller,* 276 F.3d at 429, the Eighth Circuit declined to use *Strang's* rationale to extend an exception from discharge to the joint liability that § 20(a) of the Securities Exchange Act of 1934 imposes on an innocent supervisor-broker for the fraud of the broker's employee. *Id.* It did so on the recognition that

> Section 523 of the Bankruptcy Code addresses actual, traditional fraud, and we are not persuaded that it should be read in such a way as to encompass the nontraditional liability imposed under § 20(a).

*Id.*

In briefing and argument, the Plaintiffs came back time and again to *Strang v. Bradner,* to counter the Debtors' argument that the Plaintiffs had not pleaded facts to identify wrongdoing by the Debtors themselves. The Plaintiffs insist that their bald statement of Clichelle Scott (or both Debtors) having joined a "conspiracy" to defraud "investors and creditors" of Avidigm, standing alone, is enough to plead a basis both for civil liability in the Debtors, *and* to support a deeming of culpability to the Debtors for dischargeability purposes, for anything that the other members of the alleged conspiracy had ever done to defraud the Plaintiffs. A small number of trial courts, and one Bankruptcy Appellate Panel, have held that acts intrinsically meriting nondischargeability under § 523(a) can be attributed to a debtor who did not perform them, if the debtor was a "knowing active participant" in a scheme or conspiracy through which a third-party malefactor performed the acts, and that the court can except from discharge any debt imposed on the debtor under nonbankruptcy law for damage done through the conspiracy. *In re Markarian,* 228 B.R. 34, 39 (1st Cir. BAP 1998), and trial court decisions cited therein.

However, the Plaintiffs make only a "blanket assertion" of the Debtors having joined an Avidigm-based cabal having fraud as its goal, with no detail as to when, how, and with what understandings. Nor is there any meaningful detail to establish just how the Debtors were "knowing, active participants" in its operation; there are only broad accusations, in conclusory and emotionally-charged rhetoric. There is no identification of specific access to funds, support of and active cooperation with wrongdoing, and the like. This does not satisfy the specificity requirements of Rule 8(a)(2). *Twombly,* 550 U.S. at 556 n. 3, 127 S.Ct. at 1965 n. 3.[10]

10. For that matter, as to any fraudulent actions in connection with the conspiracy, the complaint as a whole does not satisfy the requirement of Rule 9(b), that "[i]n all aver-

So the predicate fact for the argued imputation of culpability is not even pleaded; there is nothing more than the "label[ ] and conclusion[ ]," of a joining, a statement legal in character rather than factual. It is only a "formulaic recitation" of conspiracy—and that "will not do" for the purposes of Rule 12(b)(6). *Twombly,* 550 U.S. at 553–556, 127 S.Ct. at 1964–1965.[11] At oral argument John Murrin could not point to particular passages to make out more specific factual grounds for the conduit of imputed culpability that underlay the complaint. He begged off by insisting that the subject matter of conspiracy made pleading so difficult that great lenity should be afforded to him. *Twombly,* however, gives the lie to that argument.[12]

So, the complaint fails muster under Rule 8, as to the derivative-culpability theory on which the Plaintiffs would impute to the Debtors any and all fraudulent acts of anyone who trafficked in the Plaintiffs' investment into Avidigm.

This does not mean that the Debtors' motion is to be granted out of hand, at this point. It only means that the analysis is to be channeled where it belonged in the first place, toward the adequacy of the pleading as it goes to acts and conduct by the Debtors themselves. The discussion on that will be split out, under the three pleaded statutory bases for nondischargeability.

### B. 11 U.S.C. § 523(a)(2)(A)

Throughout Count I, the Plaintiffs complain that they lost the value of their "investment" in Avidigm, as the result of "dishonesty, manipulation, fraud, false pretenses and deceit," "actual fraud," "tricks and illusions, gimmicks," and the like.

 11 U.S.C. § 523(a)(2)(A) provides, in pertinent part, that:

(a) A discharge under [11 U.S.C. § ] 727 ... does not discharge an individual debtor from any debt—

...

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud ...

Under this provision, the Eighth Circuit requires the complaining creditor to prove, in connection with the debt, (i) that the debtor made a false representation of fact, (ii) that the debtor knew was false at the time the debtor made it, (iii) that the debtor made the representation with the intent and purpose of deceiving the creditor, and that (iv) the creditor justifiably relied on the representation, (v) sustaining financial injury as a proximate result of the making of the representation. *See In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987) and *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987); and, as to the element of reliance, *Field v. Mans,* 516 U.S. 59, 74–75,

ments of fraud ..., the circumstances constituting fraud shall be stated with particularity."

**11.** *Twombly* was an action under the Sherman Act. The Supreme Court held that "an allegation of parallel conduct" between ostensible competitors in the general marketplace plus "a bare assertion of conspiracy will not suffice" to plead an actual combination in violation of the antitrust laws that could survive a motion under Rule 12(b)(6). *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1966. The

substantive context of *Twombly* is quite different from the one at bar; but the common assertion of a conspiracy as the whole basis for suit, and a common lack of pleaded detail on the formation, structure, and operation of the alleged conspiracy, give *Twombly's* result a real resonance here.

**12.** Neither side cited *Twombly* in briefing or oral argument, though the opinion had been on the books for months by that point.

116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The wrongdoing targeted by the statute is a debtor's inducement to a creditor to make a loan, to give money, or to transfer property or services, through the use of a false representation of fact made *before* the credit was extended or the transfer was effected. The statute's own wording and the construction in the Eighth Circuit precedent establish that.

■ In this adversary proceeding, the starting point of the Plaintiffs' pleading is that they were mulcted in the inception of their "investment" in Avidigm.[13] However, they make no specific recitations on how the Debtors had anything to do with Avidigm's alleged fraud on them. They allege that Clichelle Scott held a "capacity ... in ... various companies" named earlier in the complaint. The only specific "capacity" they attribute to her is "Chief Financial Officer (CFO) and defacto Chief Operating Officer (CEO)" of Accredited Financial Services, Inc. ("AFS"). Complaint, ¶ 4, p. 2. The Plaintiffs do not identify the ostensible nature or function of AFS as a business entity, in relation to Avidigm or otherwise; nor do they ever specify its formal or informal relationship with Avidigm. However, they impugn AFS of participation in "conspiratorial activity perpetrated by" various individuals associated with Avidigm as well as Clichelle Scott. The allegations of wrongdoing performed through AFS by anyone are vague; so are those going to the alleged linkage between AFS's operations and any loss to Avidigm or its investors. There is an accusation that "AFS was a front for [the Debtors] to take money away from the [Plaintiffs] and other creditors and investors," which the Debtors "utilized ... to allow them to siphon off other peoples' or entities' money for their own benefit or enrich [*sic*] AFS ... so that [the Debtors] could benefit without being accountable to Avidigm, its investors or lenders." Complaint, ¶ 9, p. 5. They refer to

> AFS running, operating or controlling Avidigm, directly or indirectly which assisted it in violations involving double mortgaging of property and not repaying secured property holders when homeowner's [*sic*] would redeem it and amounting to Avidigm incurring excessive debt to benefit AFS and amounting to Avidigm not paying back loans and investments amounting in excess of 10 million dollars.

Complaint, ¶ 13, p. 8. But there is no detail by transaction with date and amount, that if proven true could be legally characterized as "a fraudulent devise [*sic*], scheme, swindle, artifice and/or manipulation" individually perpetrated by the Debtors on the Plaintiffs as they state in their formulaic, conclusory recitation.

Beyond this, and to pivotal effect, the Plaintiffs' own pleading acknowledges that "[t]he Scotts entered the operation [of Avidigm or AFS] *after* the Murrins invested money." Complaint, ¶ 14, p. 8 (emphasis added). Nowhere in the complaint is there

---

**13.** Among all the rhetoric of Count I's 15 pages, it takes a while to winkle out enough hard details about the actual circumstances and nature of the "investment." From scattered portions of the text of Count I and the remainder of the complaint, it appears that the Plaintiffs made their "investment" in late August, 2004; that the infusion of the Plaintiffs' money was to be made in the form of a loan, evidenced by a promissory note dated August 31, 2004; and that the resultant debt was to be secured by liens of some undescribed type against assets that are not specifically identified in the complaint. There are vague intimations relating to the initiation of the Plaintiffs' investment at ¶ 7, p. 4, ¶ 15, pp. 8–9; and ¶ 36, p. 16. The only description of the actual transaction with any detail is at ¶ 20, p. 11. That paragraph has some averment as to the alleged original inducement, as does ¶ 30, p. 14.

an allegation that in some other, informal capacity the Debtors aided or abetted a fraudulent inducement to make the loan, contemporaneously with its inception in August, 2004. The Plaintiffs acknowledge (again at ¶ 14, p. 8) that Clichelle Scott's formal employment with AFS began only later, sometime within the year *after* the Plaintiffs' advance to Avidigm. They mutter vaguely (at ¶ 11, p. 7) that the Debtors' "involvement [with AFS or Avidigm] may have started while they were working with Bremer Bank at or before the [Plaintiffs] invested," and "while they were insiders at Bremer Bank." But nowhere in the complaint is there any fact pleading as to how Bremer Bank was involved in any way with Avidigm; there is no other mention of Bremer Bank at all.

Simply stated, the Plaintiffs' complaint fails to plead any facts on which a fraudulent inducement to them, to lend to Avidigm in the first place, itself involved any action by either of the Debtors, or could be attributed to any contemporaneous act by either of them. To the extent that the Plaintiffs base their case under § 523(a)(2)(A) on the event of their original loan to Avidigm, the content of the pleading does not make out a "plausible" case for an exception to discharge. This presents an "insuperable bar" to any relief that would be based on that transaction, making dismissal under Rule 12(b)(6) appropriate. *See Schaaf v. Residential Funding Corp.*, 517 F.3d at 549; *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir.1997).

Again, it is difficult to pull it out of the complaint's ponderous text, but the Plaintiffs seem to propose conduct on the part of the Debtors after Clichelle Scott became employed by AFS, as additional fraud actionable under § 523(a)(2)(A). *E.g.*, ¶ 10, p. 6:

> Said scheme and swindle must be exposed and Clichelle Scott as a participant held liable either as CFO of the main alter ego participant company (AFS) or as a partner in a larger conspiracy of participants and/or as defacto President and owner of AFS.

The fatal defect with this theory is that the complaint lacks any pleading of facts that go to an inducement taking place during the period of Clichelle Scott's employment with AFS.[14] The inducement actionable under § 523(a)(2)(A) is the debtor's procurement of a change of position on the creditor's part via the use of deception.[15] The statute recognizes a "renewal, or refinancing" of pre-existing credit as a change of position; but these words presuppose a recasting of the terms on which money was originally lent before the inducement—a change in an original bargain. The Plaintiffs never actually state that they changed position as to the enforceability of their right to payment after Clichelle Scott took employment with AFS. There is no statement that the August, 2004 note became due during that time, or that it was payable upon demand, and that the Plaintiffs agreed to alter or extend any

---

**14.** The beginning- and end-points of the period, i.e., the term of Clichelle Scott's employment with AFS or her *de facto* involvement with Avidigm's affairs, are never identified by date.

**15.** *E.g., In re Lauer*, 371 F.3d 406, 413 (8th Cir.2004) (debtor commits "garden variety common law fraud" actionable under § 523(a)(2)(A) by inducing creditor to part with money or property by knowing concealment of past facts material to subject of their transaction); *In re Gibson*, 149 B.R. 562, 572 (Bankr.D.Minn.1993) (intent-to-deceive element of § 523(a)(2)(A) is satisfied by proof that debtor intended to induce creditor to change position, coupled with knowledge of falsity of representation).

preexisting right to be paid in full or partly during that time.

Beyond this, the complaint lacks any fact content going to any specific representation, regarding any fact material to the continuation of the Plaintiffs' "investment" in Avidigm, that would have been made by Clichelle Scott to the Plaintiffs, during her employment tenure with AFS—whatever the nature of AFS's relationship with Avidigm. There is much frothy verbiage about the "modus operandi" of certain other individuals involved with Avidigm. They describe that m.o. as "persuad[ing] investors and banks to provide or leave their funds with Avidigm by misrepresenting the business and overall business operation and failing to advise of the involvement of AFS and others and the true financial conditions and its inter-relationship with others." The Plaintiffs would have the intent underlying this "modus operandi" attributed to Clichelle Scott for the purposes of affixing culpability to her, from the mere fact of her employment by AFS. But they do not plead any facts that, if true, would establish a basis for derivative culpability in Clichelle Scott for dischargeability purposes—given the law's focus on the acts of a debtor herself and the disinclination to saddle a debtor with culpability for the fraudulent acts of others absent a showing of the debtor's knowledge, acquiescence, or active support, or a very close legal relationship deemed to be so interactive so as to impose joint liability. *See* discussion *supra* at pp. 8–11.

In sum, as to Clichelle Scott, the complaint fails to plead facts to make out three necessary elements under § 523(a)(2)(A), the making of fraudulent misrepresentations by her, an intent to induce the Plaintiffs to act in relation to a debtor-creditor relationship, and an inducement that actually resulted in detriment to the Plaintiffs. The content fails both the particularity requirement of Rule 9(b), as to any accusation of fraud, and the more general considerations of *Twombly's* plausibility requirement. And as to Jason Scott, there is virtually nothing in fact averment to link him to any inducement cognizable under § 523(a)(2)(A) at any time during the operation of Avidigm or AFS, as a de facto participant himself. He is never alleged to have been an employee or agent of either company at times relevant to the inception or maintenance of the debtor-creditor relationship. Nor do the Plaintiffs ever state that he acted in consort with his wife or any other person to further an inducement by promoting a misrepresentation, or that he individually deceived the Plaintiffs to the benefit of AFS, Avidigm, or any other party.

The Plaintiffs had three opportunities to frame up a plausible sequence of fact averments that, if true, would make out the commission of fraud on the Debtors' own part within the meaning of § 523(a)(2)(A), in connection with the Plaintiffs' extension or maintenance of credit to Avidigm. But they have never "told the story" of a fraud to be imputed to the Debtors, with the detail that the rules require before the Debtors may fairly be saddled with the significant burden of litigating in defense. *Cf. Bell Atlantic Corp. v. Twombly,* 550 U.S. at 558, 127 S.Ct. at 1966–1967 (noting that in antitrust lawsuit "proceeding to ... discovery can be expensive"; noting that federal trial court "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed ..." (citation and interior quotes omitted)).

To the extent that Count I of the Plaintiffs' complaint sounds under § 523(a)(2)(A), it must be dismissed.

### C. 11 U.S.C. § 523(a)(4)

In the introductory section of their complaint, the Plaintiffs accuse the Debtors of

having participated in "larceny" and "embezzlement," via their joint receipt of funds from Avidigm through the negotiation of two checks "in relationship to three properties in Wisconsin (the Oakey properties)." Complaint, ¶ 4, p. 2. In Count I, the Plaintiffs state that, as to "redemption money paid it by homeowners on properties investors and creditors financed and which were duly encumbered property," "Avidigm kept the money and misappropriated it or embezzled it to its own use or the use and benefit of AFS and its associates including" the Debtors. Complaint, ¶ 24, p. 12. Later, in Count IX, they make a general allegation that Clichelle Scott "on behalf of James Hoffman and others used AFS to embezzle or commit larceny money [*sic*] from Avidigm and thus the creditors and investors of Avidigm, including" the Plaintiffs. Complaint, ¶ 100, p. 32.

They make a statement to the effect that Clichelle Scott, engaging "in embezzlement and/or larceny ... personally, with her husband Jason Scott, [took] $60,000.00 from Avidigm ... giving $55,000.00 to AFS and keeping $5,000.00 for themselves related to the Oakey properties and possibly did this kind of thing on other transactions to be determined through discovery." Complaint, ¶ 101, p. 32. And then they state that Clichelle Scott "... obtained the 401K or retirement benefits of Steven J. Mattson for AFS or herself, depriving creditors of it. This puts her in a fiduciary position over this money." Complaint, ¶ 102, p. 32. Apparently this "fiduciary position" is to be divined and imposed from the assertion that the Plaintiffs "had a personal guarantee from Steve Mattson and were personally affected by this act," making the alleged "taking [of] the money ... a

fraudulent breach of a fiduciary duty." *Id.*

As to other alleged diversions of money flowing through Avidigm, the Plaintiffs opine:

> ... it is believed this conduct may have violated specific criminal statutes including theft by (including by fiduciary) swindle, and other statutes, both state and federal which are cited and referenced hereinafter and incorporated by reference as though fully set forth herein and made applicable to this particular allegation. There is believed to be no corporate authority to allow [Clichelle Scott] to engage in the activity she engaged in.

Complaint, ¶ 28, p. 13. Finally, after a summary allegation in Count I impugning the Debtors with "inadequate information and disclosures, representations, concealments, fraud, becoming the alter-egos, [and] committing statutory and judicial violations," the Plaintiffs allege that "[s]aid conduct was," *inter alia,* "a breach of their fiduciary duty to creditors and investors including the [Plaintiffs] and a breach of good faith and fair dealing owed [to] them." Complaint, ¶ 33, p. 15.

These are the only statements in the complaint that logically go to the Plaintiffs' invocation of 11 U.S.C. § 523(a)(4).[16] That statute provides an exception to discharge "from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny ..." It creates three distinct avenues for nondischargeability. Two of them stem from violations of relationships characterized by confidence, trust, or legal duties of loyalty; all three are founded on a debtor's improper use of access to money or property of another.

16. The references to § 523(a)(4) in Count I are in ¶ 6, p. 4, and ¶ 36, p. 16.

### 1. Breach of Fiduciary Duty

■ The exception under § 523(a)(4) for debts stemming from a dereliction of fiduciary duty requires an "express trust," or at least the existence of a set of strictly defined, legally-imposed duties to avoid self-dealing, under an objectively-manifested, preexisting, and binding relationship. The trust or the relationship must have been established before the action of the debtor that harmed the creditor. *Hunter v. Philpott*, 373 F.3d 873, 875–877 (8th Cir.2004); *In re Cochrane*, 124 F.3d 978, 984, *aff'g* 179 B.R. 628 (Bankr.D.Minn. 1995); *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir.1993); *In re Shahrokhi*, 266 B.R. 702, 707–708 (8th Cir. BAP 2001). *See also In re Bennett*, 989 F.2d 779, 784–785 (5th Cir.1993) (trust requirement of § 523(a)(4) may be satisfied by "relationships in which trust-type obligations are imposed pursuant to statute or common law"). The duty must have run directly from the debtor to the creditor, prior to the acts complained of. *In re Dloogoff*, 600 F.2d 166, 169–170 (8th Cir.1979). The existence of this fiduciary relationship is a question of federal law; not all relationships to which "trust" status may be attributed under state law, or from which obligations of a fiduciary nature may be judicially imputed under state law, will qualify. *Hunter v. Philpott*, 373 F.3d at 876; *In re Cochrane*, 124 F.3d at 984; *In re Shahrokhi*, 266 B.R. at 707. The requirement is not satisfied by basic facts that would merit the imposition of a constructive trust *after* an act of wrongdoing, under nonbankruptcy law. *Hunter v. Philpott*, 373 F.3d at 877; *In re Long*, 774 F.2d 875, 878 (8th Cir.1985).

■ As to the existence of an express fiduciary relationship running from the Debtors to the Plaintiffs, the complaint is basically incoherent. Clichelle Scott is not alleged to have been an officer of Avidigm, the entity with which the Plaintiffs made their "investment," and the vehicle through which they were allegedly wronged. At most, the complaint intimates that AFS, the entity for which she is alleged to have served as CFO, served in some undescribed way to "siphon" money from Avidigm.[17] The Plaintiffs have just not pleaded facts to establish a line of legal relationships that would bind Clichelle Scott personally to heightened, specific duties to the Plaintiffs, in relation to the monies they allege they "invested" in Avidigm. As to the accusation of trafficking in "the 401K or retirement benefits of Stephen J. Mattson" (a person whose connection to anything relevant is never described), the hazily-worded factual allegations would *not even support* the imposition of a constructive trust—there being no statement that the Plaintiffs had any property right in these funds—and that would not suffice under the Eighth Circuit's construction of § 523(a)(4).

And again, as to Jason Scott as an individual, there is no allegation that he had any authority or capacity with either of the companies involved, *de jure* or *de facto*. As a result, as to him there is even less pled on which, if proven, a fiduciary status under § 523(a)(4) could be attributed.

Finally, if the Plaintiffs intended to plead the conclusory, general accusation of "siphoning" as a platform for the imposi-

17. There is no allegation of fact to the effect that Clichelle Scott benefitted from the siphoning, anyway—other than the conclusory allegation that she and her husband kept "$5,000.00 for themselves related to the Oakey properties." But because there are no facts pleaded as to how a transaction involving the Oakey properties even figured in *Avidigm's* operations, the accusation as to this one item does not meet muster under Rules 8(a)(2), 9(b), or 12(b)(6).

**42**

tion of a constructive trust, as to any "invested" funds that passed out of Avidigm to AFS, the argument lacks legal vitality under the same Eighth Circuit precedent.

Thus, to the extent that Count I sounds under the breach-of-fiduciary-duty option of § 523(a)(4), it must be dismissed—as must Count IX, which is exclusively pleaded under that statute for its dischargeability aspect.

### 2. Embezzlement

■■■ The second exception under § 523(a)(4) is for debts created by embezzlement. The Eighth Circuit has defined "embezzlement" as "the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988) (citation and interior quotes omitted); *In re Phillips*, 882 F.2d 302, 304 (8th Cir.1989). Where property used or otherwise appropriated by a debtor is alleged to have been "property of another," i.e., that of the complaining creditor, the status of that ownership is determined with reference to the parties' contractual relationship, or to state law. *See, e.g., In re Phillips*, 882 F.2d at 304 (determining status of ownership of funds issued solely to order of individual debtor's business corporation, when funds should have been issued jointly to corporation and creditor-bank, by resort to security agreement between corporation and bank plus provisions of Uniform

Commercial Code); *Werner v. Hofmann*, 5 F.3d at 1172 (determining status of cash proceeds of livestock, from duties prescribed by parties' lease agreement).[18]

■■■ In the overfull garble of the Plaintiffs' pleading, there is no clear statement to identify *the* property *of the Plaintiffs* that would have been the subject of a misappropriation by the Debtors. The requirement cannot be satisfied by the very funds they originally "invested" in Avidigm. However much the Plaintiffs insinuate that those monies were "misappropriated," they would have become *the property of Avidigm* once Avidigm received them from the Plaintiffs.[19] Accordingly, any "investor" like the Plaintiffs could not, *in its own right*, claim a "misappropriation" that gave rise to an embezzlement—even for a self-dealt, wasteful, or excessive use of corporate funds, whether traceable to its infusion or not.

In addition, though the Plaintiffs never expressly pled that they were contractually entitled to receive a formal security interest or other lien to secure their "investment," this would not have stamped the sale proceeds of any property so encumbered, as the Plaintiffs' property. *See In re Phillips*, 882 F.2d at 304–305 (funds subject to bank's valid security interest under Article 9 nonetheless belong to bank's debtor, and are not property of bank within contemplation of embezzlement provisions of § 523(a)(4)).[20]

18. As a general proposition, nonbankruptcy law—almost always state law—furnishes the legal governance for the determination of property rights in bankruptcy cases. *Nobelman v. American Savings Bank*, 508 U.S. 324, 329, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Johnson*, 375 F.3d 668, 669–670 (8th Cir.2004); *In re*

*MJK Clearing, Inc.*, 371 F.3d 397, 401 (8th Cir.2004).

19. And, that would have been the case whether the "investment" was structured as a secured lending, which is the gist of the facts pled in Count I, or as a capital infusion giving rise to an equity interest.

20. And this conclusion presupposes that the Plaintiffs actually received such liens, in any

And, as for the Plaintiffs' three pled accusations that actually used the verb "embezzle," *supra* at p. 16, there is no accompanying pled fact allegation that would support a characterization of the subject funds as the Plaintiffs' property. As to the transaction involving the "Oakey properties" in Wisconsin, the Plaintiffs complain of the Debtors' receipt of funds "from Avidigm"; they never allege facts that would establish legal rights in the Plaintiffs, as to the money. The broader accusation regarding the alleged misuse of "redemption money" previously received by Avidigm again implies only that these funds were Avidigm's ongoing business revenues, not the Plaintiffs' personal property. Even if such "redemption money" was "duly encumbered property" as pleaded, and even if the encumbrance ran specifically to the Plaintiffs, that still makes the pleaded transaction squarely analogous to the one that the *Phillips* court held not subject to § 523(a)(4).[21]

So, as pleaded under the "embezzlement" option of § 523(a)(4), the complaint must be dismissed as well.

### 3. Larceny

▮▮ For the purposes of the third option under § 523(a)(4), "larceny," the encompassed action is the same: a misappropriation by the debtor. The two prongs differ only in the respect that "larceny" applies when the debtor came into possession by *unlawful* means. *Werner v. Hofmann,* 5 F.3d at 1172.

At most, the Plaintiffs' assertion of this option under § 523(a)(4) seems to have been a hedge—raised in the same breath as embezzlement, to be applied to the same limited number of identified transactions or conduct, but to have "spillover" effect were it to be determined that the Debtors misappropriated property of the Plaintiffs but had not first obtained it in a lawful manner.

Again, the pleading says absolutely nothing specific that, if true, would make out a nondischargeable larceny. Despite all of the Plaintiffs' bombast in accusing the Debtors of complicity in misappropriations by Avidigm and its individual principals, whether through the conduit of AFS or not, they never identify property *of theirs* that was the subject. The Plaintiffs do not identify any transactions for a larceny theory beyond those that they already identified for their embezzlement theory; so the analysis under the second prong applies with equal force to this third prong.

Thus, this last option for Counts I and IX under § 523(a)(4) must be dismissed also.

### D. 11 U.S.C. § 523(a)(6)

The Plaintiffs' last theory of nondischargeability is that their claim against the Debtors is the result of a "willful and malicious injury" to the Plaintiffs or their property, within the scope of 11 U.S.C. § 523(a)(6).

---

of the property in which Avidigm was dealing. They never quite get around to a precise statement as that, but the strong gist of the complaint is that their expectations of receiving liens as "promised" were never fulfilled.

21. The Plaintiffs characterize the transactions in the Oakey properties as a "purchase and subsequent 'kickback,' " complaint at ¶ 4, p. 2, but they never expand on this and they never recite facts to the effect that the Debtors

were not entitled to receive something from the transactions—even in the recitations in Count IX. So, the only picture to be discerned from the complaint's rambling averments about these events is that Avidigm, AFS, or the Debtors used funds in which someone or something had a lien of some sort, without applying them to the lien and paying them instead in part to the Debtors. Under the analysis of *Phillips,* that could not have been an embezzlement.

This exception to discharge presupposes an act analogous to an intentional tort, i.e., the infliction of a detriment, the causing of a loss, where the actor intended both the act of infliction and its consequences. *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *In re Patch*, 526 F.3d 1176, 1180 (8th Cir.2008). Nondischargeability under § 523(a)(6) may lie in consequence of a conversion of the property of another, including a debtor's conversion of property subject to a complaining creditor's security interest. *In re Long*, 774 F.2d at 879–881. However, a mere technical conversion, i.e., a debtor's de facto diversion and use of property value otherwise belonging to another or pledged to a creditor, does not evidence willfulness and malice per se so as to satisfy the statutory elements. *In re Long*, 774 F.2d at 879 ("... a conversion of property (a simple interference with legal rights) is not enough in itself to prevent discharge of a debt"). The creditor must plead and prove that, in effecting such a conversion, the debtor acted with both of the two sorts of intent, which are distinct and which are both essential elements under the statute. *In re Long*, 774 F.2d at 880–881.

These variant forms of scienter are defined with reference to the RESTATEMENT (SECOND) OF TORTS. *In re Stage*, 321 B.R. 486, 492–493 (8th Cir. BAP 2005) (citing RESTATEMENT (SECOND) OF TORTS, §§ 8A, 7(1), and 7(2)). Willfulness means an intent to cause an "injury," i.e., to invade a legally-protected interest of the plaintiff; malice is an intent to cause "harm," a cognizable loss or detriment in fact, or at least an intent to go forward in

acting where "the harm was substantially certain or nearly certain to result." *Id.*[22]

And, at a more basic level, a creditor must establish both that the debtor in bankruptcy *him- or herself* inflicted the injury in fact, *and* that he or she harbored the requisite intent in acting. *In re Porter*, 539 F.3d at 894.

Given these requirements under binding precedent, the sprawling sloppiness of the Plaintiffs' pleading is most deficient as to this theory. In the text of Count I, the Plaintiffs give no more than a sketchy identification of the corollary tort that would be the platform for the application of § 523(a)(6). The allegations of fraud and any fact-pleading that would go to its elements do not suffice; given the specificity of the theory embodied in § 523(a)(2)(A), a creditor cannot "double-count" the same facts to qualify a debt as nondischargeable under both §§ 523(a)(2)(A) and 523(a)(6). *In re Neumann*, 374 B.R. 688, 711 (Bankr.D.Minn. 2007); *In re Khouri*, 397 B.R. 111, 121 (Bankr.D.Minn.2008). Ultimately, the only fact pleading in Count I that conceivably goes to § 523(a)(6) is limited to two assertions. First, it is alleged broadly that Clichelle Scott "divert[ed] Avidigm funds to enrich [the Debtors] and others illegally." Complaint, ¶ 9, p. 5.[23] Second, the Plaintiffs state that "it is believed that [the Debtors] in conspiracy with James Hoffman [previously named as Avidigm's main principal] and others, converted the [Plaintiffs] promised security to illusory security." Complaint, ¶ 22, p. 12. In Count X of the complaint, entitled "WILLFUL AND

---

**22.** In *In re Porter*, 539 F.3d at 893–895, the Eighth Circuit revoiced its standard for willfulness and malice with very much the same thought as the *Stage* panel, though it did not cite or quote the Restatement directly.

**23.** At least in concept and implication, this accusation overlaps with the recrimination of "siphon[ing] off other peoples' or entities' money for their own benefit or enrich [*sic*] AFS." Complaint, ¶ 10, p. 6.

MALICIOUS INJURY BY THE DEBT-OR TO ANOTHER ENTITY OR TO THE PROPERTY OF ANOTHER ENTI-TY," these allegations are repeated without any meaningful expansion. In that count, the Plaintiffs again plead a general request for an award of damages under nonbankruptcy law, and add a closing demand that "this be declared a debt that is non-dischargeable."

None of this pleads a plausible basis in fact to satisfy § 523(a)(6). The Plaintiffs make no factual references to the specifics of negotiation and agreement as to the terms of their "investment" into Avidigm, the execution of security agreements or financial instruments, or any specific contractual undertakings, to make out the continuation, new creation, or vesting in the Plaintiffs of property interests in funds that they now characterize as the subject of diversion or "siphoning." They do not plead the specifics of acts and events that, if true, would implicate Clichelle Scott, an officer of a different corporation, in any act undertaken by Avidigm or its principals to funnel money previously-lent to Avidigm toward purposes outside its ordinary operations. They do not state that Clichelle Scott herself effected the transfers out of Avidigm. They certainly do not allege that she had or purported to exercise authority from Avidigm to meddle with its operating capital.

And as to the one specifically-named transaction, the Plaintiffs do not make any factual statement relating to the Debtors'

alleged receipt of funds linked to the Oakey properties, that could characterize that one identified acquisition as an actual conversion of property of the Plaintiffs or an act of complicity with one.[24]

Given these deficiencies, the complaint does not plead even the threshold element of a technical conversion of property of the Plaintiffs. There is nothing described in the complaint, that, if true, would establish that property legally or directly chargeable to the Plaintiffs, as owners or secured parties, was taken from them through Avidigm's operations. Beyond that, there is no fact pleading that would go to the elements of willfulness or malice: no description of circumstances that would evidence that Clichelle Scott knew of a specific property right in the Plaintiffs in any of the funds from Avidigm that the Plaintiffs allege she handled; that she intended to impair or deprive the Plaintiffs of any such legal right; or that she intended to see that the Plaintiffs permanently lost the value of their "investment" in Avidigm.[25]

Counts I and X of the complaint do not contain fact averments that, if true, would satisfy the elements of nondischargeability under § 523(a)(6). Their rambling verbiage certainly does not make out a plausible case for an exception from discharge. Thus, the Plaintiffs' request for determination of dischargeability under those counts must be dismissed as well.

IV. Outcome, as to Plaintiffs' Complaint

Plaintiff John O. Murrin is an attorney who has practiced for over thirty years in

---

24. The conclusory label of "fraudulent conveyance or voidable transfer or preferential item [*sic*] improper and illegal and obtaining property by false pretenses" is only a legal characterization, and does not suffice under Rule 12(b)(6). The only other reference to this property and a transaction in it is a mention of a "purchase and subsequent 'kickback' as exemplified by check # 21814 dated 11/21/05 and check # 21749 dated 11/3/05 from Avidigm to [the Debtors]." This sen-

tence managed to be both cryptic (the detail standing out in utter isolation as it did) and histrionic.

25. And the paucity of allegations going to those claims is established beyond peradventure as to Jason Scott—who stood at a far remove from the actual operations of either AFS or Avidigm, by all pleaded indications.

this state. He had three chances to lay out a "short and plain statement" of his and his wife's case against the Debtors for nondischargeability.[26] His third effort did not come materially closer to doing that than his first did. Murrin had ample opportunity to step far back from the invested and emotionally-charged posture of a party-litigant, to look at the situation from the cool distance of an advisor-advocate, and to act professionally as an officer of the court to avoid a waste of judicial and party resources. He did not make responsible use of that opportunity. He certainly is not to be granted a fourth try. This matter is ripe for a disposition with prejudice to further litigation on the merits.

Under the rulings just made, the Plaintiffs may not maintain a dischargeability proceeding against the Debtors. All of their requests for a determination of nondischargeability will be dismissed pursuant to Rule 12(b)(6). The Plaintiffs' claims for damages under nonbankruptcy law then will be subject to the effect of discharge under Chapter 7; so those counts must be dismissed as barred by 11 U.S.C. § 524(a)(1).

### V. Debtors' Motion for Imposition of Sanctions

■ At the end of his clients' motion, the Debtors' counsel requested an award of attorney fees from the Plaintiffs, to be made as a sanction under "Bankruptcy Rule 9011." Counsel's citation was no more specific than that. He cited only one published decision, an older one by a judge of this Court, *In re KTMA Acquisition Corp.*, 153 B.R. 238 (Bankr.D.Minn.1993).

The skeletal development in the briefing seems to reflect a dated knowledge of the

law of sanctions under the Federal Rules of Bankruptcy Procedure. Stronger proof of that is found in the lack of recitations in the motion to evidence counsel's compliance with the procedural prerequisites under FED. R. BANKR.P. 9011(c)(1)(A), for the imposition of sanctions pursuant to FED. R. BANKR.P. 9011(c)(2).

Thus, the Debtors' motion for an award of attorney fees must be denied. Due to the gravity of the Plaintiffs' failure to adequately replead, the denial will be without prejudice. However, to minimize further delay in the closing of the Court's file, the Debtors' counsel will have to quickly renew his motion, in full facial and procedural compliance with the *current* text of Rule 9011.

### VI. Current Disposition of Adversary Proceeding

The dismissal of the Plaintiffs' complaint pursuant to Rule 12(b)(6) is entirely warranted. However, the Debtors' originally-pleaded demand for an award of attorney fees has not been disposed of via final order. To ensure that all issues in suit in this adversary proceeding are adjudicated in one order, signaling the commencement of a single period for the pursuit of subsequent relief, entry of an order formally dismissing this adversary proceeding will be deferred pending any renewed motion by the Debtors for imposition of sanctions. *See* discussion in *In re Ibach*, 399 B.R. 61, 72 (Bankr.D.Minn.2008) and *In re Langeslag*, 366 B.R. 51, 63–64 (Bankr.D.Minn. 2007), and authorities cited therein. Accordingly,

IT IS HEREBY DETERMINED AND ORDERED:

---

**26.** This adversary proceeding was the first time that the undersigned has ever given a complaining creditor more than one chance to refine an initial dischargeability pleading that was facially deficient. An instance where a creditor failed to adequately amend its complaint on that second chance, and then suffered dismissal, does not come readily to mind.

1. The Defendants' motion for dismissal will be granted, but entry of an order according that relief will be deferred.

2. The Defendants' motion for an award of attorney fees against the Plaintiffs is denied without prejudice.

3. No later than *April 20, 2009*, the Defendants' counsel shall serve and file any renewed motion for imposition of sanctions on the Plaintiffs.

4. If the Defendants' counsel does not timely act pursuant to Term 3, the Court will enter an order dismissing this adversary proceeding immediately thereafter, and will not entertain a renewed motion for imposition of sanctions. If counsel does timely act, the dismissal will be further deferred pending entry of an order on the Debtors' renewed motion.