# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3694

_____

| | | |
|---|---|---|
| Vernon Schaaf; Julian Boik; | * | |
| Alfred Streufert, on behalf of | * | |
| themselves and others similarly | * | |
| situated, | * | |
| | * | |
| Plaintiffs/Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Residential Funding Corporation; | * | |
| Heller Financial, Inc., | * | |
| | * | |
| Defendants/Appellees, | * | |
| | * | |
| Marshall & Isley Bank, | * | |
| | * | |
| Defendant. | * | |

_____

Submitted: April 12, 2007
Filed: February 22, 2008

_____

Before WOLLMAN, BEAM, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Investors Vernon Schaaf, Julian Boik, and Alfred Streufert appeal the district court's[1] dismissal of their claims against Residential Funding Corporation (RFC) and Heller Financial, Inc. The district court concluded that the investors failed to plead a sufficient causal nexus between their financial losses and the allegedly fraudulent actions of RFC and Heller. Alternatively, the district court rejected the investors' common law fraud claims because they failed to allege reliance, and dismissed their claims under the Minnesota Consumer Fraud Act (MCFA) because those claims did not seek to secure a public benefit. We affirm based on the first ground.

I.

We recite the facts according the allegations of the investors' complaint. In November 1997, United Homes, Inc., issued debentures worth about $7,000,000, which paid 11% annual interest. According to the offering's prospectus, United intended to use the proceeds to pay off a $2.6 million line of credit bearing an interest rate of 25%, while using the remainder to pay off debt to Heller (which bore a rate of 9.4% on June 30, 1997) and RFC (9.75% on June 30, 1997). Before allowing United to proceed with the offering, the Securities and Exchange Commission (SEC) required United to disclose in its prospectus the amount of its debt to Heller and RFC, and whether United was in compliance with the terms of this debt. Without contacting either lender to confirm that it actually was in compliance, United modified the prospectus to indicate its supposed compliance with the terms of its indebtedness to Heller and RFC. Several weeks later, United requested lenders' certificates from Heller and RFC indicating that United was in compliance with the terms of its debt.

On November 14, 1997, the SEC declared United's prospectus "effective," meaning that the offering's underwriter could begin selling the securities. *See* 15

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Susan Richard Nelson, United States Magistrate Judge for the District of Minnesota.

U.S.C. § 77e. After the prospectus was deemed effective, but before United had hired an underwriter, RFC and Heller provided certificates indicating that United was not in default. The plaintiffs allege that both certificates were fraudulent because United had triggered defaults by violating its debt-to-worth covenant with each lender.

A day after receiving the lenders' certificates, United entered into an underwriting agreement with Miller & Schroeder Financial (M & S). The underwriting agreement required United to represent to M & S that neither United nor any subsidiary of United was "in default with respect to any provision of any . . . loan agreement . . . to which it [was] a party or by which it may be bound." After receiving this assurance, M & S went ahead with the offering. The investors allege that M & S would not have proceeded had it known that United was in violation of its debt-to-worth covenants with its lenders. They also allege that Heller and RFC recognized that M & S would rely on the lenders' certificates. The plaintiffs maintain that if M & S had refused to proceed with the offering, then the plaintiffs could not have purchased the securities and would not have suffered the ensuing financial losses.

The offering began on November 25, 1997, and extended into 1998. The plaintiffs purchased debentures in November and December 1997 based on M & S's oral representations that the debentures were "worthy investments for investors seeking income investments." Each plaintiff received a prospectus along with his purchase.

In April 1998, Heller declared United in default of its credit agreement for failing to comply with the agreement's reporting requirements. This declaration terminated United's revolving line of credit with Heller.

On November 16, 1998, RFC informed United that United had violated the loan agreement's debt-to-worth requirement, the same covenant that the plaintiffs allege was the subject of the fraudulent lenders' certificates. For a short time, United and

RFC amended the loan agreement to remedy the default. In February 1999, however, RFC declared that United's loans were "presently in default and accordingly RFC is entitled to withhold further disbursement and to exercise its rights and remedies under the Loan Documents." Citing a "severe cash flow shortage" at United, RFC sought to extricate itself from the relationship. Still, RFC did not foreclose on its collateral at this point. It held out hope that United could improve its financial position by selling off assets or issuing equity. Later, in June 1999, when United requested RFC's permission to pay interest on the debentures using RFC's funds, RFC refused, declaring that it would allow United to use its RFC credit line only to fund expenses that would "directly result in the completion of partially built houses forming part of [RFC's] collateral." On February 8, 2000, RFC foreclosed on its loans to United, writing that "Events of Default are numerous and include, but are certainly not limited to, the fact that interest on the loans has not been paid since December, 1998."

The source of United's "severe cash flow shortage" was the poor performance of some of its business ventures. In the fall of 1998, United failed to sell as many homes as anticipated. In this period, "United's Arizona activities . . . performed poorly . . . due to a number of local factors including specific project locations, zoning issues, and personnel issues." These business failures cascaded because of United's heavy debt load. When United's creditors refused to advance new lines of credit, United was doomed to insolvency. On March 9, 2000, after a credit line with National City Bank finally dried up, United filed its petition for bankruptcy, making the debentures worthless.

The plaintiffs first sued M & S under the federal Securities Act of 1933, 15 U.S.C. §§ 77k, 77l, and the Minnesota Securities Act, Minn. Stat. § 80A.40 *et seq.* In that suit, the state trial court refused to certify a class proposed by the plaintiffs, and M & S later declared bankruptcy. The plaintiffs commenced this suit in state court against Heller and RFC, asserting violations of the MCFA and claims of common law fraud and unjust enrichment. Heller and RFC removed the case to the

district court, which dismissed the plaintiffs' claims. The district court adopted the report and recommendation of a magistrate judge, which concluded that the plaintiffs had failed to plead a sufficient causal nexus between their injuries and the allegedly fraudulent lenders' certificates. Alternatively, the district court concluded that the plaintiffs' MCFA claims did not satisfy the statute's requirement that such claims seek to secure a "public benefit." The court also rejected plaintiffs' common law fraud claims on the ground that they had failed to allege that they relied on Heller and RFC's fraudulent lenders' certificates.

## II.

On appeal, the investors argue that the district court erred in dismissing their claims on the ground that they failed to allege loss causation in their complaint. In addition, they maintain that their MCFA claim provided sufficient public benefit to satisfy the requirements of the statute, and that they adequately alleged reliance for their common law fraud claims. The investors also appeal the district court's dismissal of their aiding and abetting claims against Heller and RFC, as well as the court's dismissal of their claim against Heller for unjust enrichment.

## A.

We review the district court's grant of a motion to dismiss *de novo. In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 788 (8th Cir. 2006). Dismissal is proper where the plaintiffs' complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). At this stage of the litigation, we accept as true all of the factual allegations contained in the complaint, and review the complaint to determine whether its allegations show that the pleader is entitled to relief. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007); Fed. R. Civ. P. 8(a)(2). The plaintiffs need not provide specific facts in support of their allegations, *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam), but they must include sufficient

factual information to provide the "grounds" on which the claim rests, and to raise a right to relief above a speculative level. *Twombly*, 127 S. Ct. at 1964-65 & n.3. The complaint must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Otherwise, a plaintiff with no hope of showing proximate causation could require inefficient expenditure of resources and potentially induce a defendant to settle a meritless claim. *Id.*

To prevail on a tort claim, a plaintiff must show that the defendant's tortious actions caused the plaintiff's losses. W. Page Keeton et al., *Prosser and Keeton on Torts* § 41 (5th ed. 1984). When ruling on a motion to dismiss, we look to whether the plaintiffs' allegations suffice to show the required causal connection between the defendant's wrongful conduct and the plaintiffs' losses. *Dura*, 544 U.S. at 347. In the securities context, this requirement means that the plaintiff must adequately plead both "transaction causation" and "loss causation." *Harris v. Union Elec. Co.*, 787 F.2d 355, 367 (8th Cir. 1986); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005); *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 538 (Minn. 1986). To prove transaction causation, the plaintiff must show that the defendant's fraud induced the plaintiff to purchase the security. *Harris*, 787 F.2d at 367. Put another way, the plaintiff must show that but for the misrepresentation, he would not have purchased the security. Loss causation, on the other hand, corresponds to the common law's requirement of proximate causation. *Lentell*, 396 F.3d at 172-73; *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). This doctrine requires the plaintiff to prove "a causal connection between the material misrepresentations and the loss." *Dura*, 544 U.S. at 342.

Though loss causation is an "exotic name" for this concept, the standard does not differ from that employed in a common law fraud case. *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683-85 (7th Cir. 1990). Unless the plaintiff can show that the defendant's fraud caused his loss, he cannot recover. *See Dura*, 544 U.S. at 343-44.

In a securities case, this standard requires the plaintiff to show that the defendant's fraud – and not other events – caused the security's drop in price. *See Specialized Tours*, 392 N.W.2d at 537 (quoting *Prosser and Keeton on the Law of Torts* § 110, at 767). This is because the security's "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343. Thus, to recover for securities fraud at common law and under SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, the plaintiff must show "that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173 (emphasis in original).

The district court applied this standard to the plaintiffs' common law fraud claims and their claims under the MCFA. The investors and the Attorney General of Minnesota, as *amicus curiae*, argue that the common law requirement of loss causation does not apply to claims under the MCFA, which they say has a more permissive standard for showing causation.

To assert a remedy for damages arising out of a violation of the MCFA, Minnesota law requires that a private plaintiff be "injured by" the violation. Minn. Stat. § 8.31, subd. 3a. In *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001), the Supreme Court of Minnesota addressed how a plaintiff could prove that it had been "injured by" a violation of the State's consumer protection laws. Several health maintenance organizations (HMOs) brought suit against cigarette manufacturers in federal court, asserting that the tobacco companies had marketed their products unlawfully, leading to greater costs to the insurers. The manufacturers' marketing, and their discouragement of tobacco education programs, allegedly had induced plan members to consume more tobacco products, thus increasing the HMOs' costs. In defense, the tobacco companies argued that the HMOs could not prove that they had been injured by the violations of the MCFA without showing that the

misrepresentations actually induced particular plan members to consume more tobacco products.

The federal district court certified this question of state law to the Supreme Court of Minnesota. That court opined that "it is not necessary to plead *individual consumer reliance* on the defendant's wrongful conduct to state a claim for damages" under the MCFA, because the legislature had "eliminated the requirement of pleading and proving traditional common law reliance as an element of a statutory misrepresentation in a sales action." *Id*. at 13 (emphasis added). Nevertheless, the court declared that "causation remains an element of such a claim," and that it would be necessary for the plaintiffs to prove reliance on the defendants' statements or conduct to satisfy the causation requirement. *Id*. In the tobacco case before it, the court stated that "the showing of reliance that must be made to prove a causal nexus need not include direct evidence of reliance by individual consumers of defendants' products." *Id*. at 14. Rather, the court explained that "the causal nexus and its reliance component" could be established by "direct or circumstantial evidence that . . . is relevant and probative as to the relationship between the claimed damages and the alleged prohibited conduct." *Id.*

The investors argue that *Group Health* relaxed the common law's causation requirements, and that the MCFA does not require the investors to satisfy the loss causation standard applied by the district court. Although the investors appeared to concede in the district court that they must prove loss causation, (R. Doc. 59, at 35), they now seem to argue that loss causation is not required at all, and that they may prevail merely upon a showing of transaction causation. (Appellants' Br. 25; Reply Br. 9). We reject this far-reaching contention.

*Group Health* shows that the MCFA relaxes the common-law standard for proving reliance, which is one element of common-law causation. In the securities context, reliance is another way of describing transaction causation, *Harris*, 787 F.2d

at 366, and *Group Health* continues to require proof of reliance under the MCFA. The relaxation of proof required to establish reliance or transaction causation, moreover, does not eliminate the need for a plaintiff to prove that the defendants proximately caused his financial loss. As *Group Health* recognized, the MCFA provides a remedy only to those actually "injured by" the wrongdoer's misconduct. Minn. Stat. § 8.31, subd. 3a. This limitation would be virtually meaningless if there were no requirement to show proximate loss causation. While the MCFA in some respects is designed "to make it easier to sue for consumer fraud than it had been to sue for fraud at common law," *Wiegand v. Walser Auto Groups, Inc.*, 683 N.W.2d 807, 812 (Minn. 2004), we are not persuaded that the Minnesota legislature intended "to provide investors with broad insurance against market losses," rather than "to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345.

The state attorney general appears to acknowledge that the plaintiffs must show some degree of loss causation, but contends that the *Dura* standard for federal securities cases, which requires a "causal connection" between the material representation and the loss, 544 U.S. at 342, is "more burdensome" than the standards of "legal nexus" or "causal nexus" that Minnesota courts have applied under the MCFA. We are not persuaded that there is a difference between a "legal nexus," "causal nexus," and "causal connection" for purposes of showing loss causation. *Group Health* established that plaintiffs in at least certain cases are not required to present "direct evidence of reliance" by individual customers, but the court was clear to say that "causation is a necessary element in a damages claim" under the MCFA. 621 N.W.2d at 14. And the Supreme Court of Minnesota favorably cited our court's opinion in *In re Control Data Corp. Securities Litigation*, 933 F.2d 616, 619 (8th Cir. 1991), for the proposition that "some causal nexus" is required between the conduct of the defendant and the change in market price that damaged the plaintiff. *Group Health*, 621 N.W.2d at 14. *Control Data Corp.*, in turn, followed the earlier precedent of *Harris v. Union Electric Co.*, which specifically required a plaintiff to prove traditional "loss causation." *See Harris*, 787 F.2d at 366 (citing *Wilson v. Comtech*

*Telecomm. Corp.*, 648 F.2d 88, 92 n.7 (2d Cir. 1981); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 & n.24 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983)).

Our understanding of the MCFA thus conforms to federal law dealing with claims for securities fraud. Although a plaintiff must show both transaction causation and loss causation, the courts presume transaction causation when an investor buys or sells stock at a price set by a liquid market in reliance on the integrity of that price. *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."). Nevertheless, this reduced standard for pleading reliance does not relieve the plaintiff of his burden of pleading loss causation. *Dura*, for example, was a "fraud on the market" case in which the Court cited the nonconclusive presumption of reliance on the alleged misrepresentations, 544 U.S. at 341-42, but nonetheless required the plaintiffs to plead loss causation to survive a motion to dismiss.

We thus conclude that the MCFA's requirement that a plaintiff be "injured by" conduct of the defendant does not allow for recovery unless a plaintiff can show that the defendant's actions proximately caused the plaintiff's losses. Because *Dura* and other federal cases address the standard for proximate causation in cases of securities fraud, we find them instructive. To prevail, the plaintiffs must plead and prove that the loss was foreseeable and caused by the materialization of the concealed risk. *Lentell*, 396 F.3d at 173.

The complaint in this case does not sufficiently allege proximate causation. The investors argue that Heller and RFC concealed United's default and the risk that Heller and RFC could declare a default based on United's violation of its debt-to-worth covenants. They contend that they were injured when this risk materialized. But the investors cannot have been "injured by" this nondisclosure, because there is

-10-

no allegation that either lender acted upon United's violation of the debt-to-equity covenants in November 1997 in a way that harmed United or its debenture-holders. Heller allegedly declared United in default in April 1998 because of United's failure to comply with the loan's reporting requirements. RFC cited United's failure to pay interest on RFC's loans as its primary example of numerous default events before foreclosing on the loan's collateral. Thus, the investors' losses were not "caused by the materialization of the concealed risk" that Heller and RFC would declare a default because of United's breach of its debt-to-worth covenants in 1997. *See Lentell*, 396 F.3d at 173. Rather, United's failure to deliver financial information to Heller caused Heller to declare United in default, and United's failure to pay interest on its loans caused RFC to foreclose on the loans.

With respect to RFC only, rather than rely solely on RFC's foreclosure on the loans in 2000, the plaintiffs seek to connect their injury to a November 1998 letter from RFC to United. This letter noted that United was in default because of its breach of its debt-to-worth covenant – the same covenant that was the subject of the default that RFC allegedly concealed in 1997. The investors argue that this November 1998 notification caused their damages, because in June 1999, RFC refused to lend United funds to pay interest on the debentures. But plaintiffs have not adequately alleged how RFC's 1998 letter, or the breach it recognized, *caused* RFC to stop lending money to United. According to the investors' allegations, RFC knew that United was in breach of its debt-to-worth covenant since November 1997, but the complaint alleges that RFC's critical refusal to lend occurred later, in June 1999. Thus, United's default on the debt-to-worth covenant, in and of itself, cannot have caused RFC to discontinue the necessary lending to United.

The passage of time between the November 1997 lenders' certificates and United's bankruptcy in March 2000 further demonstrates the inadequacy of the complaint. The *Dura* court noted that "the longer the time between purchase and sale, . . . the more likely that other factors caused the loss." *Dura*, 544 U.S. at 343. The

passage of time in this case is particularly significant, because the complaint alleges that United suffered from poor home sales in the fall of 1998, which caused slowdowns in production and closings, which in turn reduced the availability of cash to United. The *Dura* court noted that such a change in economic circumstances could defeat a plaintiff's attempt to prove loss causation and give added significance to the passage of time. *Id.* at 342-43.

Because we conclude that the district court properly dismissed the common-law fraud claims and the MCFA claims for failure adequately to allege loss causation, we need not address whether the debentures were "merchandise" under the MCFA, or whether the investors' complaint alleges a "public benefit." We also need not consider whether the plaintiffs' allegations of reliance suffice to state a claim for common law fraud.

B.

The investors next argue that Heller and RFC aided and abetted United and M & S in their scheme to defraud the investors. Because we conclude that allegedly concealing the 1997 defaults could not have proximately caused the investors' losses, we similarly conclude that any misrepresentation about these defaults by United or M & S could not have caused the plaintiffs' losses. United is alleged to have prepared its prospectus before seeking certificates from its lenders, so the alleged concealment of the default could not have contributed to United's disclosures. In any event, the investors have not alleged how Heller and RFC substantially assisted any distinct fraud by United. Therefore, the district court properly dismissed the aiding and abetting claim. *See Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985); Restatement (Second) of Torts § 876.

## C.

The investors also argue that the district court erroneously dismissed their claim for unjust enrichment against Heller. The plaintiffs allege that United used the proceeds of the offering to pay off some of its debt to Heller, and that these proceeds unjustly enriched Heller. The district court concluded that without valid fraud claims, the investors could not recover for unjust enrichment.

To establish a claim for unjust enrichment under Minnesota law, the plaintiff must "show that the defendant has knowingly received or obtained something of value for which the defendant 'in equity and good conscience' should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (quoting *Klass v. Twin City Fed. Sav. And Loan Ass'n*, 190 N.W.2d 493, 494-95 (Minn. 1971)). "The theory of unjust enrichment is based on what the person allegedly enriched has received, not on what the opposing party has lost." *Georgopolis v. George*, 54 N.W.2d 137, 142 (Minn. 1952). Thus, to state a claim, the plaintiff must plead more than that "one party benefit[ted] from the efforts or obligations of others," but instead must allege "that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981). Thus, unjust enrichment does not occur when a defendant "is enriched by what he is entitled to under a contract or otherwise." 1 Dan B. Dobbs, *Law of Remedies* § 4.1(2), at 558 (2d ed. 1993).

Here, the investors have failed to allege that Heller was not entitled to the proceeds it received from United. Indeed, they admit that Heller *was* entitled to these funds, stating in their complaint that these funds enabled United to reduce its debt to Heller by half. The loan agreement between United and Heller provided a contractual basis for Heller's receipt of the funds. Hence, the district court properly dismissed the investors' claim for unjust enrichment.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____