**Blair J. GREIMAN, Plaintiff,**

**v.**

**John HODGES, in his official capacity as Chair of the Iowa Board of Parole; the Iowa Board of Parole; John R. Baldwin, in his official capacity as Director of the Iowa Department of Corrections; and the Iowa Department of Corrections, jointly and severally, Defendants.**

No. 4:13–cv–510.

United States District Court,
S.D. Iowa,
Central Division.

Signed Jan. 15, 2015.

John B. Whiston, College of Law, Iowa City, IA, for Plaintiff.

William A. Hill, John R. Lundquist, Attorney General of Iowa, Des Moines, IA, for Defendants.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is a Motion to Dismiss filed by the Iowa Board of Parole ("IBOP"), John Hodges, in his official capacity as Chair of the IBOP, the Iowa Department of Corrections ("IDOC"), and John R. Baldwin, in his official capacity as Director of the IDOC (collectively "Defendants"). Clerk's No. 2. Blair J. Greiman ("Plaintiff") filed a resistance to the Motion. Clerk's No. 7. Defendants did not file a reply. The Court held a hearing on the matter (Clerk's No. 15) and it is now fully submitted.

## I. FACTUAL BACKGROUND

In 1982, a jury convicted Plaintiff of first degree kidnapping, a Class A felony, in violation of Iowa Code §§ 710.1(3) and 710.2. *See* Pet. (Clerk's No. 1–1) ¶ 11. At the time of the offense, Plaintiff was sixteen years old. *Id.* On October 4, 1982, Plaintiff was sentenced to life imprisonment without parole, which at the time was the mandatory sentence for all persons convicted of Class A felonies. *Id.* ¶ 12 (citing Iowa Code § 902.1).

On May 17, 2010, the United States Supreme Court ruled that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." *Graham v. Florida*, 560 U.S. 48, 82, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010); Pet. ¶ 13. Specifically, the Court held that while a "State is not required to guarantee eventual freedom to such an offender," it nonetheless "must impose a sentence that provides some meaningful opportunity for release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 50, 130 S.Ct. 2011; Pet. ¶ 14. On October 15, 2010, relying on *Graham*, Plaintiff filed a Motion to Correct Illegal Sentence in the Iowa District Court for Cerro Gordo County. Pet. ¶ 17. In December 2010, the Iowa Supreme Court held that, pursuant to *Graham*, Iowa Code § 902.1 was unconstitutional as applied to juveniles to the extent it mandated life imprisonment without parole for nonhomicide Class A felonies. *Bonilla v. State*, 791 N.W.2d 697, 700–02 (2010); Pet. ¶ 15. In July 2011, the Iowa legislature amended § 902.1 to provide that a juvenile sentenced to life imprisonment for a Class A felony shall be eligible for parole after serving a minimum of twenty-five years confinement. Iowa Code § 902.1; Pet. ¶ 16. On February 20, 2012, a state judge of the second judicial district determined that Plaintiff's sentence of life without parole for a nonhomicide offense was unconstitutional under both federal and Iowa law. *Id.* ¶ 18. The judge granted Plaintiff's Motion to Correct Illegal Sentence, vacated Plaintiff's sen-

tence of life without parole, and resentenced him to life *with* the possibility of parole. *Id.*

Because Plaintiff had already spent more than twenty-five years in custody, he was eligible for parole immediately upon his resentencing. *Id.* ¶¶ 19–20. On June 26, 2012, the IBOP reviewed Plaintiff's case and denied parole, concluding that "[i]n view of the seriousness of the crime for which you were convicted, the Board believes that a parole at this time would not be in the best interest of society." *Id.* ¶ 21. In September 2012, Plaintiff was again considered for parole and was again denied on the same basis. *Id.* ¶ 22. Plaintiff appealed the September 2012 denial of parole, but his appeal was denied. *Id.* ¶ 22.

Plaintiff contends that the IBOP failed to provide him a "meaningful opportunity for parole" when the IBOP summarily denied him parole based solely on the seriousness of his offense and failed entirely to "take into account [Plaintiff's] youth and demonstrated maturity and rehabilitation as required under the new constitutional and statutory mandates." *Id.* ¶¶ 20, 23–25. Plaintiff also complains that the IDOC has a policy that requires him to take sex offender classes before he can be released on parole, but only permits inmates with less than two years before discharge to take such classes. *Id.* ¶¶ 28–29. Thus, since Plaintiff does not have a defined discharge date, he has been denied permission to enroll in sex offender classes, and in turn, cannot fulfill the necessary steps to obtain parole. *Id.* ¶ 29–31 ("Mr. Greiman, who has a life sentence with eligibility for parole, is effectively placed [by virtue of not being eligible for sex offender classes] in the same situation as he was previously—a juvenile offender serving life sentences *without* eligibility for parole.").

Plaintiff filed a Petition against Defendants in the Iowa District Court for Polk County, Iowa on November 22, 2013, asserting that Defendants' actions deprived him of due process and subjected him to cruel and unusual punishment, in violation of the Federal and Iowa Constitutions. *See generally* Pet. Plaintiff requests that the Court: (1) issue a declaratory judgment that Defendants' actions violate the Federal and Iowa Constitutions; (2) order the IDOC to provide Plaintiff with a meaningful opportunity for parole by permitting him to take sex offender classes to become parole eligible; (3) order the IBOP to provide Plaintiff with a meaningful opportunity for parole by requiring it to consider in its parole decision Plaintiff's youth at the time of the offense and his demonstrated maturity and rehabilitation; (4) order the IBOP to provide Plaintiff with a meaningful opportunity for parole by requiring it to develop and implement policies that appropriately take into account in parole decisions youth at the time of offense and demonstrated maturity and rehabilitation; (5) order the IBOP to recognize distinctions between children and adults that have been identified by case law as relevant to parole determinations; (6) retain jurisdiction over the case until all unconstitutional practices and polices have been remedied; (7) award Plaintiff costs and fees; and (8) order such further relief as the Court deems proper. *Id.* at 9–10. Defendants timely removed the action to the United States District Court for the Southern District of Iowa on December 23, 2013. Clerk's No. 1.

## II. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). In reviewing a complaint, a court

must "accept as true all of the factual allegations contained in the complaint," and must draw "all reasonable inferences ... in favor of the plaintiff." *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 549 (8th Cir.2008) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A viable complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.' It is not, however, a 'probability requirement.'" *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937).

The Supreme Court, in *Ashcroft v. Iqbal,* described a "two-pronged approach" for evaluating complaints challenged under Rule 12(b)(6). *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. First, a court should divide the allegations between factual and legal allegations; factual allegations should be accepted as true, but legal allegations should be disregarded. *Id.* Second, the factual allegations must be parsed for facial plausibility. *Id.*

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.... Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 678, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

The "parsing" process requires careful examination of the plaintiff's allegations, however, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden,* 588 F.3d at 594. Indeed, "[r]equiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party, and would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject." *Id.* at 597 (internal quotations and citations omitted).

A court will "draw on its judicial experience and common sense" when determining whether a complaint states a plausible claim for relief. *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937. Thus, the Court may consider other, more likely explanations for the acts described in the complaint when determining whether the pleaded factual allegations give rise to a plausible entitlement to relief. *Id.* at 680, 129 S.Ct. 1937. But, the Court must always be mindful that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). "[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition

or strike suit, [a court] must also take account of [his or her] limited access to crucial information." *Braden,* 588 F.3d at 597.

## III. LAW AND ANALYSIS

 "To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted). "[Section] 1983 demands more than a simple claim that the [Defendants] engaged in wrongful conduct and the [Plaintiff was] deprived of constitutional rights. Indeed, to state a cause of action under § 1983, a plaintiff must plead facts that would tend to establish that the defendant's wrongful conduct caused the constitutional deprivation." *Zutz v. Nelson,* 601 F.3d 842, 851 (8th Cir.2010).

 In this case, Plaintiff contends that Defendants have deprived him of his constitutional rights to be free from cruel and unusual punishment and to due process, pursuant to the Eighth and Fourteenth Amendments of the Federal Constitution and pursuant to Article I, §§ 9 and 17 of the Iowa Constitution.[1] In particular, Plaintiff claims that his federal and state constitutional rights have been infringed because Defendants have denied Plaintiff a meaningful opportunity to obtain release: (1) by failing to consider Plaintiff's youth at the time of the offense and by failing to consider Plaintiff's demonstrated growth, maturity, and rehabilitation as part of the parole review process; and (2) by denying Plaintiff participation in sex offender treatment that is a precondition to Plaintiff's parole eligibility, thereby *de facto* eliminating Plaintiff's meaningful opportunity for parole.

### A. *Overview of Pertinent Case Law*

The existence of a distinction between juveniles and adults is well rooted in federal jurisprudence. *See, e.g., Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658,

---

**1.** The Fourteenth Amendment provides: "No state shall ... deprive any person of life liberty, or property, *without due process of law.*" Likewise, Article 1, § 9 of the Iowa Constitution provides: "No person shall be deprived of life, liberty, or property, without due process of law."

The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *See Furman v. Georgia,* 408 U.S. 238, 239, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Similarly, Article I, § 17 of the Iowa Constitution provides that "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." State another way, these provisions "guarantee[ ] individuals the right not to be subjected to *excessive sanctions.*" *Roper v. Simmons,* 543 U.S. 551, 561, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (noting that "[t]he right flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" (quoting *Atkins v. Virginia,* 536 U.S. 304, 311, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002))). In determining whether a punishment is cruel and unusual, "courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" *Graham,* 560 U.S. at 58, 130 S.Ct. 2011 (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *see also State v. Bruegger,* 773 N.W.2d 862, 882 (Iowa 2009) ("Article I, section 17 of the Iowa Constitution prohibits cruel and unusual punishment in language materially identical to its federal counterpart. Our past cases have generally assumed that the standards for assessing whether a sentence amounts to cruel and unusual punishment under the Iowa Constitution are identical to the Federal Constitution.").

125 L.Ed.2d 290 (1993) ("A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions."); *Eddings v. Oklahoma,* 455 U.S. 104, 115–16, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (stating that age is "more than a chronological fact" and observing that children "generally are less mature and responsible than adults"); *Bellotti v. Baird,* 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality) (noting that juveniles "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them"); *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) ("The prosecution says that the youth and immaturity of the petitioner ... are irrelevant.... But if we took that position, it would ... be in callous disregard of this boy's constitutional rights. He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions."); *Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (plurality) (emphasizing that "special care" must be employed in evaluating the voluntariness of a juvenile's confession: "Age 15 is a tender an difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces."). In light of this distinction, the United States Supreme Court has issued numerous decisions in the last few decades concluding that the Eighth Amendment dramatically limits the imposition of the harshest sentences on juvenile offenders.

In *Thompson v. Oklahoma,* a plurality of the Court concluded that evolving standards of decency prohibited a death sentence for persons under age sixteen at the time of the commission of the offense. *See* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). Seventeen years later, in *Roper v. Simmons,* the Supreme Court expanded this holding to individuals under age eighteen at the time of the commission of the offense, explaining that juveniles under age eighteen differ from adults in very fundamental ways: (1) they have a "lack of maturity and an underdeveloped sense of responsibility" as compared to adults that "often result in impetuous and ill-considered actions and decisions"; (2) they are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and (3) "the character of a juvenile is not as well formed as that of an adult" and the "personality traits of juveniles are more transitory, less fixed." *See Roper,* 543 U.S. at 569–71, 125 S.Ct. 1183. According to the *Roper* Court, "[t]hese differences render suspect any conclusion that a juvenile falls among the worst offenders" and make clear that the penological justifications for the death penalty—retribution and deterrence—apply to juveniles with lesser force that they do to adults:

> The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved char-

acter. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.

*Id.* at 570, 125 S.Ct. 1183 (internal quotations and citations omitted).

In 2011, the Supreme Court went a step further in *Graham,* holding that the Eighth Amendment prohibits the imposition of a life sentence without parole[2] for nonhomicide offenses committed by juvenile offenders. *Graham,* 560 U.S. at 74, 130 S.Ct. 2011. Reiterating the differences between juveniles and adults identified in *Roper,* and explaining that "[l]ife without parole is an especially harsh punishment for a juvenile," the Court determined that, "none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification" for a life without parole sentence for a juvenile nonhomicide offender. *Id.* at 71–74, 130 S.Ct. 2011. In further articulating the constitutional requirements for juvenile offenders in such circumstances, the Court held:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first

instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society.

. . .

Terrance Graham's sentence [of life without parole] guarantees he will die in prison without any meaningful opportunity to obtain release, no matter what he might do to demonstrate that the bad acts he committed as a teenager are not representative of his true character, even if he spends the next half century attempting to atone for his crimes and learn from his mistakes. The State has denied him any chance to later demonstrate that he is fit to rejoin society based solely on a nonhomicide crime that he committed when he was a child in the eyes of the law. This the Eighth Amendment does not permit.

. . .

The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee

---

**2.** "[L]ife without parole is 'the second most severe penalty permitted by law.' " *Graham,* 560 U.S. at 69, 130 S.Ct. 2011 (quoting

*Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)).

the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term.

*Id.* at 75, 79, 82, 130 S.Ct. 2011.

■ Finally, in 2012, the Supreme Court added one additional restriction on life without parole sentencing of juveniles. In *Miller v. Alabama*, the Court held that the Eighth Amendment forbids subjecting a juvenile to a *mandatory* sentence of life imprisonment without parole in homicide cases, finding that "[s]uch mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it."[3] —— U.S. ——, 132 S.Ct. 2455, 2467, 183 L.Ed.2d 407 (2012). Thus, under *Miller*, a State *may* ultimately impose a life without parole sentence against a juvenile convicted of homicide, but only *after* the sentencer has the opportunity to consider *all* the mitigating circumstances, including the offenders age and age-related characteristics. *Id.* at 2475. Though technically permissible, the Supreme Court emphasized that, "given all we have said in *Roper, Graham,* and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *See id.* at 2469 ("This is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (quoting *Roper,* 543 U.S. at 573, 125 S.Ct. 1183; *Graham,* 560 U.S. at 68, 130 S.Ct. 2011)).

In 2013, the Iowa Supreme Court arguably expanded the protections available to juvenile offenders when it determined that *Miller*-type protections, i.e., individualized sentencing evaluations, are constitutionally required in cases where a juvenile is sentenced to either a *de facto* life sentence, or to a term of years that would effectively deprive him of a meaningful opportunity for release on parole during his lifetime. *See State v. Null,* 836 N.W.2d 41, 72–76 (Iowa 2013) (holding that *Miller*'s protections are fully applicable to "a lengthy term-of-years sentence" and require judges sentencing juveniles to recognize: (1) that children are constitutionally different than adults and cannot be held to the same standard of culpability in sentencing; (2) that children are more capable of change than adults; and (3) that lengthy prison sentences without the possibility of parole for juveniles are appropriate, "if at all, only in rare or uncommon cases"); *State v. Pearson,* 836 N.W.2d 88, 96 (Iowa 2013) (finding that *Miller*'s reasoning applies "equally to [a juvenile's] sentence of thirty-five years without the possibility of parole" and that the Iowa Constitution "requires an individualized sentencing hearing where [a term of years sentence is imposed that] effectively deprive[s] [a juvenile] of any chance of an earlier release and the possibility of leading a more normal adult life"); *State v. Ragland,* 836 N.W.2d 107, 121–22 (Iowa 2013) (finding

---

**3.** The Court articulated the teachings of *Graham* and *Roper* in recapping the "wealth of characteristics and circumstances attendant to [youth]," but also explained that consideration must be given to a juvenile's home life, his role in the homicide offense, the impact of familial and peer pressure on the circumstances of the offense, and the likelihood of rehabilitation. *Miller,* 132 S.Ct. at 2468. As well, the court noted that youth often have difficulties not experienced by adults in dealing with police and prosecutors and in assisting their attorneys. *Id.*

that the "same motivation behind the mandates of *Miller* applies to [the sixty year mandatory minimum] sentence in this case or any sentence that is the practical equivalent to life without parole."). The Iowa Supreme Court extended protections for juveniles even more in 2014, holding that "all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional under the cruel and unusual punishment clause" of the Iowa Constitution. *State v. Lyle*, 854 N.W.2d 378, 400 (Iowa 2014) ("Mandatory minimum sentences for juveniles are simply too punitive for what we know about juveniles.").

### B. *Iowa Parole Provisions*

Iowa Code § 906.4(1) provides that a "parole ... shall be ordered only for the best interest of society and the offender, not as an award of clemency." Pursuant to the statute, the IBOP "shall release on parole ... any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person." *Id.* An individual's release is deemed not to be a detriment to the community if the "person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination." *Id.*

The IBOP must "establish and implement a plan by which the board systematically reviews the status of each person who has been committed [to the IDOC] and considers the person's prospects for parole or work release." Iowa Code § 906.5(1)(a). Defendants point out that the Iowa Administrative Code does not require in-person parole reviews; rather, parole reviews may be conducted through inmate case file reviews. Defs.' Br. (Clerk's No. 2–1) at 4 (citing Iowa Admin. Code § 205–8.6(1) (providing that the IBOP "may review the records of an inmate ... and consider the inmate's pros-

pects for parole ... at any time")); *see also* Iowa Admin. Code § 205–8.13 ("Case review procedure. The board or board panel may consider the inmate's records and other information with respect to history, current situation, parole and work release prospects, and other pertinent matters. A case review may take place at any time and is in addition to any other required review."). Factors to be considered in parole decisions include previous criminal record, nature and circumstances of the offense, recidivism record, convictions and behavior that indicates a propensity for violence, participation in programming, mental health evaluations, length of time served, evidence of institutional misconduct, risk assessments, and any other information deemed relevant to the parole decision. Iowa Admin. Code § 205–8.10(1).

### C. *Analysis*

#### 1. *Cruel and unusual punishment.*

■ Defendants first argue that Plaintiff cannot establish that his sentence is cruel and unusual under either the Federal or the State Constitution. According to Defendants, Plaintiff is claiming an "entitlement to more than just parole eligibility and the normal review processes provided for by Iowa law ... [Plaintiff is claiming an entitlement to] some sort of enhanced or super parole release review, above and beyond that given to other parole eligible inmates." Defs.' Br. at 7. Defendants argue that Plaintiff is not entitled to any sort of enhanced parole review, or even to parole review different from that provided to adult offenders, because *Graham* is "limited to sentencing procedures" and is inapplicable to "release or parole considerations." *Id.* at 7–8 ("[T]he only guarantee to which [Plaintiff] is entitled under the *Graham* decision is that he not be given a life sentence at the outset.").

The Court disagrees with Defendants that *Graham* has no applicability outside the context of a juvenile's initial sentencing. While Defendants are correct that the State has no obligation to guarantee Plaintiff release during his lifetime, *Graham* explicitly held that, "[w]hat the State *must do* ... is give [juvenile nonhomicide offenders] some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75, 130 S.Ct. 2011. It is axiomatic that a juvenile offender could only prove increased maturity and rehabilitation warranting release from custody at some time well after a sentence is imposed. *See id.* at 79, 130 S.Ct. 2011 (stating that the Eighth Amendment does not permit a State to deny a juvenile offender the chance "to *later demonstrate* that he is fit to *rejoin* society based solely on a nonhomicide crime that he committed while he was a child in the eyes of the law"). In Iowa, such an opportunity could only reasonably exist during parole review due to Iowa's indeterminate sentencing scheme. As Plaintiff aptly points out, the sentencing judge was required by statute to sentence Plaintiff to life without the possibility of parole because Plaintiff was convicted of a Class A felony. Following *Graham*, Plaintiff's sentence was modified to life *with* the possibility of parole. Like the initial sentencing judge, however, the judge who modified Plaintiff's sentence had no discretion whatsoever in the sentence to be imposed. Rather, the ultimate length of Plaintiff's prison sentence will be determined by the IBOP, because it alone has the authority to grant Plaintiff release. *See State v. Peckenschneider*, 236 N.W.2d 344, 347 (Iowa 1975) ("In 1907 ... the responsibility of determining the length of a prison sentence was shifted from the trial court to the board of parole.") (citing *State v. Cupples*, 260 Iowa 1192, 1196, 152 N.W.2d 277 (1967)). Thus, it appears clear

that, at least under the facts of this case, the responsibility for ensuring that Plaintiff receives his constitutionally mandated "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" lies squarely with IBOP and the other State-actor Defendants.

Defendants next contend that the procedures employed by the IBOP in conducting a case file review of Plaintiff's eligibility for parole were constitutionally adequate under *Graham*. Defendants seem to imply that the IBOP naturally considered all factors articulated in Iowa Administrative Code § 205–8.10(1), and that this "totality of the circumstances" review necessarily included consideration of Plaintiff's age at the time of the offense, as well as an evaluation of his maturation and rehabilitation since that time. Defs.' Br. at 8–9 (arguing that the IBOP is not prohibited from taking into consideration "*all* relevant information" in its parole decisions and that age at the time of the offense "is of limited value, by itself" in the determination). Thus, according to Defendants, by "evaluating the totality of the circumstances, the IBOP acted well within its discretion to deny [Plaintiff] parole when, in its informed opinion, [Plaintiff's] release was not in the best interests of society." *Id.*

The Court cannot conclude as a matter of law at this early stage of the proceedings that the IBOP's parole review procedures either are or are not compliant with the constitutional mandate of *Graham* when applied to juveniles. Even if it could make such a determination, the Court cannot simply presume that such procedures were actually employed by the IBOP in this case. In reviewing Plaintiff's complaint, the Court must "accept as true all of the factual allegations contained in the complaint," and must draw "all reasonable inferences ... in favor of the plaintiff."

*Schaaf,* 517 F.3d at 549. Applying that principle here, the relevant "facts" before the Court are: (1) that the IBOP "fail[ed] to take account of [Plaintiff's] youth and demonstrated maturity and rehabilitation" when it "summarily denied his parole" (Pet.¶¶ 20–23); (2) that the IBOP denied Plaintiff's parole based solely on the "seriousness of the offense. No other grounds were considered" (Pet.¶ 24); and (3) that the IBOP's "current policies . . . fail to take into account . . . youth at the time of [the] offense and . . . demonstrated maturity and development." Accepted as true, these *allegations* state a plausible § 1983 claim that Defendants, acting under color of state law, have wrongfully deprived and continue to deprive Plaintiff of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," thereby violating his right to be free from cruel and unusual punishment under the Federal and State Constitutions.

Defendants also argue that Plaintiff cannot premise his cruel and unusual punishment claim on the IDOC's policy prohibiting him from taking sex offender treatment classes because inmates have no constitutional right to any particular court or class of treatment while in prison. Defs.' Br. at 9 (citing *Stewart v. Davies,* 954 F.2d 515, 516 (8th Cir.1992) and *Wishon v. Gammon,* 978 F.2d 446, 450 (8th Cir.1992)). Plaintiff, however, does not claim that he is directly deprived of a constitutional right by virtue of being denied sex offender treatment; rather, Plaintiff claims that the IDOC's policy results in a *de facto* denial of his right to a "meaningful opportunity to obtain release" pursuant to *Graham.* More specifically, Plaintiff alleges that the IDOC's policy on participating in sex offender treatment categorically excludes Plaintiff from par-

ticipation because he does not have a defined discharge date. Pet. ¶¶ 29–30. Because the IDOC and IBOP require sex offender treatment as a condition of parole eligibility, Plaintiff is, in effect, denied not just of a meaningful opportunity for parole; he is denied *any* opportunity for parole. *Id.* at 29–31. Considering the current procedural posture of the case, the Court agrees with Plaintiff that he has presented at least a plausible § 1983 claim that Defendants' policy in this regard results in a *de facto* life without parole sentence that is prohibited by *Graham* and its progeny.

For the reasons stated above, Defendants' Motion to Dismiss Plaintiff's Federal Eighth Amendment and State Article I § 17 claims is denied.

### 2. *Due process.*

 Plaintiff's due process claims are premised on the same conduct by Defendants that Plaintiff asserts in support of his cruel and unusual punishment claims, i.e., that Defendants' parole review process and policies regarding participation in sex offender treatment classes operate to deny him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." According to Defendants, these allegations fail to support a § 1983 due process cause of action for many of the same reasons Defendants claim they fail to support a § 1983 cruel and unusual punishment claim. Defendants additionally contend that Plaintiff's due process claims fail because Plaintiff simply "wants a parole," but case law establishes that Plaintiff "has no constitutional right to receive a parole or work release" because Plaintiff has no protected liberty interest in obtaining a parole.[4]

---

4. The Due Process clause only "applies when government action deprives a person of liber-

ty or property." *Greenholtz v. Inmates of the*

Defs.' Br. at 10–13 ("[Plaintiff] therefore has no liberty interest subject to due process protection that attaches to his mere hope of receiving a parole. In the absence of a protected liberty interest, the only process that is due those seeking early release in Iowa are those procedures specifically enumerated by the statutes or rules governing the parole decision-making process. Thus, [Plaintiff] is not permitted to assail the propriety of the parole system itself; any attack must be limited to the State's failure to adhere to protocol in its application." (quotation marks omitted, citing *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979)); *Schreiber v. State*, 666 N.W.2d 127, 130 (Iowa 2003); *State v. Cronkhite*, 613 N.W.2d 664, 668 (Iowa 2000); *State v. Wright*, 309 N.W.2d 891, 894 (Iowa 1981)).

While Defendant is no doubt correct that Plaintiff ultimately "wants a parole," Plaintiff's claims in this action are in actuality much broader. Plaintiff is not, as Defendant seems to presume, claiming that Defendants applied fair and appropriate parole policies to him and reached the wrong conclusion on whether to grant parole. Rather, Plaintiff asserts that *Graham* guarantees him a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," and that Defendants' existing procedures and policies deprive him of the "meaningful opportunity" to which he is entitled. Though subtle, the distinction is important. In *Greenholtz*, the Supreme Court determined that when a state "holds out the *possibility* of parole" it "provides no more than a mere hope that the benefit will be obtained"; such a

"general interest" is "no more substantial than the inmate's hope that he will not be transferred to another prison, a hope which is not protected by due process." 442 U.S. at 11, 99 S.Ct. 2100. The present case is distinguishable because although *Graham* stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a *possibility* of parole or a "mere hope" of parole; it creates a categorical entitlement to "demonstrate maturity and reform," to show that "he is fit to rejoin society," and to have a "meaningful opportunity for release." *See Graham*, 560 U.S. at 79, 130 S.Ct. 2011. Because Plaintiff's Petition clearly alleges facts that, if true, would support a conclusion that Defendants have denied him process to which he is due, namely a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," Plaintiff has adequately stated a plausible due process claim and Defendants' Motion to Dismiss must be denied.[5] *See Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

### 3. *Novel constitutional claims.*

The Court agrees with Plaintiff that the claims presented in this action are novel ones, particularly given the recency of *Graham* and the correspondent lack of case law analyzing its scope and applicability. Case law and legal commentators

---

*Neb. Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

**5.** The Court notes that the Iowa Constitution arguably provides an even stronger basis for

Plaintiff's due process claims that does the Federal Constitution, given the Iowa Supreme Court's rulings in *Null, Ragland, Pearson*, and *Lyle*.

both encourage the denial of Rule 12(b)(6) motions where novel or unique theories are presented. *See, e.g., McGary v. City of Portland,* 386 F.3d 1259, 1270 (9th Cir. 2004) ("Court[s] should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." (quoting 5 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 1357, at 601–03 (1969))); *Igartua–De La Rosa v. United States,* 417 F.3d 145, 192 (1st Cir.2005) (same). Accordingly, given that Plaintiff has asserted important constitutional claims which present issues of first impression, the Court finds that discovery and full consideration of the case on the merits is warranted.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss (Clerk's No. 2) is DENIED in its entirety.

IT IS SO ORDERED.